UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

JARED SOLOMON,

Defendant.

24 Cr. 665 (LAP)

**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
TO THE DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

SEAN S. BUCKLEY
Attorney for the United States,
Acting under Authority Conferred
by 28 U.S.C. § 515
26 Federal Plaza
New York, New York 10278

Adam Z. Margulies
Assistant United States Attorney
    *-Of Counsel-*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 2

    A.    The Defendant's Wire Fraud ................................................................... 2

    B.    The Defendant's Aggravated Identity Theft .......................................... 5

PROCEDURAL BACKGROUND ....................................................................................... 7

ARGUMENT ....................................................................................................................... 8

I.    The Motion to Dismiss the Indictment as Legally Defective Should Be Denied ................ 8

    A.    Applicable Law ......................................................................................... 8

        1.    In General ..................................................................................... 8

        2.    Void for Vagueness ................................................................... 10

    B.    Discussion ...............................................................................................11

        1.    The Indictment Is Sufficient Under Rule 7(c) ...........................11

        2.    The Indictment States the Material Elements of Each Offense ............. 13

        3.    The Allegations in the Indictment Are Not Unconstitutionally Vague ......................................................................................... 16

II.    The Motion to Dismiss the Indictment as Time-Barred Should Be Denied ...................... 17

    A.    Applicable Law ...................................................................................... 17

    B.    Discussion .............................................................................................. 19

CONCLUSION ................................................................................................................. 21

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .......................................................................... 16

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) .......................................................................... 16

*Boyce Motor Lines, Inc. v. United States,*
   342 U.S. 337 (1952) ............................................................................ 8

*Costello v. United States,*
   350 U.S. 359 (1956) ............................................................................ 8

*Goyal v. United States,*
   2025 WL 307236 (S.D.N.Y. Jan. 27, 2025) ..................................... 2, 15, 19

*Neder v. United States,*
   527 U.S. 1 (1999) ............................................................................. 14

*Russell v. United States,*
   369 U.S. 749 (1962) ...................................................................... 9, 13, 15

*United States v. Adelglass,*
   2022 WL 6763791 (S.D.N.Y. Oct. 11, 2022) ..................................... 12

*United States v. Alfonso,*
   143 F.3d 772 (2d Cir. 1998) ................................................................ 9

*United States v. Almaleh,*
   2022 WL 602069 (S.D.N.Y. Feb. 28, 2022) ....................................... 15

*United States v. Bergstein,*
   2018 WL 2417845 (S.D.N.Y. May 29, 2018) ..................................... 19

*United States v. Carton,*
   2018 WL 3559172 (S.D.N.Y. July 10, 2018) ..................................... 15

*United States v. Chime,*
   2011 WL 3420717 (N.D. Ohio Aug. 4, 2011) ..................................... 14

*United States v. Colello,*
   2022 WL 220216 (S.D.N.Y. Jan. 25, 2022) ....................................... 2, 19

*United States v. Cosme,*
   2021 WL 2964322 (2d Cir. July 15, 2021) ..................................... 19–20

*United States v. Cruikshank,*
   92 U.S. 542 (1875) ............................................................................ 17

*United States v. Dawkins,*
    999 F.3d 767 (2d Cir. 2021) ................................................... 10

*United States v. De La Pava,*
    268 F.3d 157 (2d Cir. 2001) ................................................ 1, 8

*United States v. Goldberg,*
    756 F.2d 949 (2d Cir. 1985) ..................................................... 8

*United States v. Halloran,*
    821 F.3d 321 (2d Cir. 2016) ................................................... 10

*United States v. Hoey,*
    2016 WL 270871 (S.D.N.Y. Jan. 21, 2016) ........................... 18

*United States v. Hoey,*
    725 F. App'x 58, 62 (2d Cir. 2018)............................... 18, 20–21

*United States v. Houtar,*
    980 F.3d 268 (2d Cir. 2020) .............................................. 10–11

*United States v. Hwa,*
    2021 WL 11723583 (E.D.N.Y. Sept. 3, 2021) ....................... 16

*United States v. Juwa,*
    508 F.3d 694 (2d Cir. 2007) ................................................... 10

*United States v. Klein,*
    476 F.3d 111 (2d Cir. 2007)....................................................14

*United States v. Lanier,*
    520 U.S. 259 (1997) ............................................................... 11

*United States v. Mermelstein,*
    487 F. Supp. 2d 242 (E.D.N.Y. 2007) .............................. 14, 19

*United States v. Morrison,*
    686 F.3d 94 (2d Cir. 2012) ..................................................... 10

*United States v. Motz,*
    652 F. Supp. 2d 284 (E.D.N.Y. 2009) ................................... 15

*United States v. Payne,*
    591 F.3d 46 (2d Cir. 2010) ..................................................... 20

*United States v. Peraire-Bueno,*
    2025 WL 2062021 (S.D.N.Y. July 23, 2025) ........................ 17

*United States v. Person,*
    373 F. Supp. 3d 452 (S.D.N.Y. 2019) ................................. 1, 16

*United States v. Pirro,*
    212 F.3d (2d Cir. 2000) ..................................................... 14–16

*United States v. Refert,*
    2007 WL 30292 (D.S.D. Jan. 3, 2007) ................................................ 19

*United States v. Rivera-Ventura,*
    72 F.3d 277 (2d Cir. 1995) ................................................ 17–18

*United States v. Rutigliano,*
    790 F.3d 389 (2d Cir. 2015) ................................................ 18, 20

*United States v. Rybicki,*
    354 F.3d 124 (2d Cir. 2003) ................................................ 16

*United States v. Simmons,*
    96 U.S. 360 (1877) ................................................ 17

*United States v. Smith,*
    555 F. Supp. 3d 563 (N.D. Ill. 2021) ................................................ 18, 20

*United States v. Stringer,*
    730 F.3d 120 (2d Cir. 2013) ................................................ 9, 12, 15–16

*United States v. Sullivan,*
    2004 WL 253316 (S.D.N.Y. Feb. 10, 2004) ................................................ 12

*United States v. Shvartsman,*
    722 F. Supp. 3d 276 (S.D.N.Y. 2024) ................................................ 17

*United States v. Toussie,*
    397 U.S. 112, 115 (1970) ................................................ 18–21

*United States v. Upton,*
    856 F. Supp. 727 (E.D.N.Y. 1994) ................................................ 14

*United States v. Vilar,*
    729 F.3d 62 (2d Cir. 2013) ................................................ 9

*United States v. Wahab,*
    2022 WL 17581560 (S.D.N.Y. Dec. 12, 2022) ................................................ 12, 13

*United States v. Walsh,*
    194 F.3d 37 (2d Cir. 1999) ................................................ 9, 12

*United States v. Walters,*
    910 F.3d 11 (2d Cir. 2018) ................................................ 10

*United States v. Wey,*
    2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) ................................................ 15

*United States v. Yannotti,*
    541 F.3d 112 (2d Cir. 2008) ................................................ 1, 9, 11–12

*United States v. Yashar,*
    166 F.3d 873 (7th Cir. 1999) ................................................ 20–21

*United States v. Zandstra,*
    2000 WL 1368050 (S.D.N.Y. Sept. 20, 2000) ........................................................ 11, 14–15

**Statutes and Rules**

18 U.S.C. § 2 ............................................................................................................... 7

18 U.S.C. § 666 ........................................................................................................... 20

18 U.S.C. § 1028A ...................................................................................................... 7

18 U.S.C. § 1343 ........................................................................................................7, 20

18 U.S.C. § 3237 ......................................................................................................... 18

18 U.S.C. § 3282 ......................................................................................................... 17

Fed. R. Crim. P. 7 ................................................................................................. *passim*

Fed. R. Crim. P. 12 ..................................................................................................... 8

## INTRODUCTION

The Government respectfully submits this memorandum of law in opposition to defendant Jared Solomon's motion to dismiss the indictment (the "Motion to Dismiss" or "Def. Mot."). (Dkt. No. 36.) The defendant's motion should be denied. The defendant comes nowhere near meeting his heavy burden to obtain dismissal of the Indictment, which is an "extraordinary remedy" reserved for "extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001).[1] The defendant principally argues that the Indictment does not sufficiently allege offenses against him under the Federal Rules of Criminal Procedure and Constitution, and further argues that the charges in the Indictment violate the five-year statute of limitations. These arguments are meritless.

The Indictment, which tracks the language of the relevant statutes and contains particularized "to wit" clauses, is more than sufficient to satisfy the pleading requirements under Rule 7(c) of the Federal Rules of Criminal Procedure, and provides the defendant with ample constitutional notice of the charges against him. *See United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (to satisfy the pleading requirements of Fed. R. Crim. Proc. 7(c), "an indictment need do little more than to track the language of the statute charged and state the time and place . . . of the alleged crime"); *United States v. Person*, 373 F. Supp. 3d 452, 461 (S.D.N.Y. 2019) (to prevail on a vagueness challenge, the defendant must show that (1) "the statute fails to provide a person of ordinary intelligence fair notice of what is prohibited" or (2) "is so standardless that it authorizes or encourages seriously discriminatory enforcement"). The Indictment also properly charges the defendant with committing the continuing offenses of wire fraud and aggravated

---

[1] Unless otherwise noted, case quotations omit internal quotation marks, citations, and previous alterations.

identity theft through at least 2023—well within the five-year statute of limitations period.  *See, e.g.*, *Goyal v. United States*, No. 19 Cr. 844 (CS), 2025 WL 307236, at *10 (S.D.N.Y. Jan. 27, 2025) (recognizing wire fraud as a continuing offense); *United States v. Colello*, No. 20 Cr. 613 (LTS), 2022 WL 220216, at *2 (S.D.N.Y. Jan. 25, 2022) (same for aggravated identity theft).

Accordingly, the Motion to Dismiss should be denied in its entirety without a hearing.

## FACTUAL BACKGROUND

From at least 2009 through at least 2023, the defendant—who was a leasing associate and later a vice president of office leasing at a commercial real estate company ("Victim Company-1")—engaged in a continuing scheme to defraud Victim Company-1 of over $9.5 million.  During at least part of that scheme—from at least 2015 through at least 2023—the defendant used the names and signatures of other persons without their knowledge or authorization as a means of carrying out the scheme.  The defendant used most of the fraud proceeds—approximately $7 million—to finance two large real estate purchases in his and his wife's names, and spent the remainder on various personal expenditures, including a Porsche and a country club membership.

### A.    The Defendant's Wire Fraud

The defendant carried out his fraud scheme by using fake commercial real estate agreements—mainly fake broker agreements, among other types of agreements—and fake invoices that called for Victim Company-1 to issue checks and wire payments to one of three purported real estate broker companies: "Margoux Media," "Cobalt Advisors," and a third purported company, identified herein as Victim-2 Affiliates (collectively, the "Fake Broker Companies").[2]  The defendant falsely represented to his Victim Company-1 superiors, Victim

---

[2] While the defendant invented the fake broker names "Margoux Media" and "Cobalt Advisors," as described more fully below, he used the name of an actual commercial real estate broker—without that broker's knowledge or authorization—for the third Fake Broker Company.  To protect the privacy interests of that victim real estate broker at this stage of the case, the Government refers

Company-1 administrative staff, and Victim Company-1 payroll employees that each fake agreement and invoice he presented was an actual agreement and invoice for an actual broker company that performed actual services for Victim Company-1 or a Victim Company-1 counterparty on a real estate deal within the defendant's portfolio.

Those representations were fraudulent. In fact, Margoux Media and Cobalt Advisors were not real companies, and they performed no broker services (or any other type of services) for Victim Company-1 or a counterparty. Victim-2 Affiliates was the name of an actual broker company, but the defendant had no affiliation with Victim-2 Affiliates, and he likewise used a fake broker agreement and fake invoice calling for Victim Company-1 to write a check made out to Victim-2 Affiliates—all without the knowledge of the owner of the real Victim-2 Affiliates.

To receive the proceeds of the fraud scheme, the defendant—using his own name, signature, and other personal identifying information—opened business bank accounts for each of the three Fake Broker Companies, each referenced herein as a "Fraud Bank Account" and together the "Fraud Bank Accounts". For a given fake agreement and invoice that the defendant presented to Victim Company-1 to request a fraudulent payment, the defendant would either deposit a check written from Victim Company-1 to one of the Fake Broker Companies into the corresponding Fraud Bank Account, or he would have Victim Company-1 wire the payment directly into that account. No one apart from the defendant was a signatory on any of the Fraud Bank Accounts.

In addition to using fake commercial real estate agreements, invoices, and bank accounts, the defendant also used fake email addresses and burner phone numbers to further the fraud scheme. For example, in late January 2019, the defendant created an email account for an

---

to the individual owner of that real estate broker company as "Victim-2" and Victim-2's company as "Victim-2 Affiliates."

apparently fake identity (identified herein as "Marc M.") as reflected in records obtained from that email account's provider ("Provider-1").[3]  Just one week later, the defendant connected his superior at Victim Company-1—who had concerns about authorizing a $1.4 million payment to Margoux Media—with "Marc M."  More specifically, the defendant emailed his superior and "Marc M." at the email address the defendant had created, initiating an email exchange in which "Marc M."—someone whom the defendant falsely held out to be a representative of a company affiliated with Margoux Media—demanded the requested payment from the defendant's superior.[4]

Ultimately, Victim Company-1 authorized the $1.4 million wire payment to a Fraud Bank Account, as called for in a fake agreement and invoice the defendant had presented to Victim Company-1.[5]  Only one week later, the defendant, in turn, wired that amount, plus nearly $1 million in additional fraud proceeds that the defendant had previously obtained from Victim Company-1, to a real estate attorney to finance part of the purchase of a $4 million apartment located in the Upper East Side of Manhattan (the "Manhattan Property").

As another example of the defendant's fraudulent conduct, in May 2023, the defendant presented two fake agreements and two fake invoices to his Victim Company-1 superiors, calling for Victim Company-1 to make payments of $2.475 million and $2.5 million, for a total of $4.975

---

[3] The defendant created the email account for "Marc M." using a Provider-1 account that was registered in the defendant's own name and associated with the defendant's own email address, home address, and phone number.  In September 2023, shortly after the defendant fraudulently induced Victim-1 to pay him approximately $5 million in June 2023 (the last fraud payments the defendant received as part of the scheme), the defendant deleted that email account.

[4] During this email exchange, the defendant's superior repeatedly attempted to set up a call with "Marc M.," but "Marc M." ignored those requests, presumably because the defendant knew that his superior would have been able to identify "Marc M.'s" voice as the defendant's.

[5] The $1.4 million wire payment was initiated from a Victim-1 bank account in New Jersey to the Fraud Bank Account located in New York.

million, to a Fraud Bank Account for non-existent broker and construction funding services.  On June 16, 2023, Victim Company-1 wired the first payment—$2.475 million—to the Fraud Bank Account.  As the end of the month approached, the defendant emailed Victim Company-1 employees to pressure them to make the remaining $2.5 million wire payment by no later than June 27, 2023, falsely stating, "[t]hey have to close out/settle all no later than Wednesday June 28th with all parties."  On June 26, 2023, Victim Company-1 made the remaining wire payment of $2.5 million to a Fraud Bank Account.  The next day, the defendant wired approximately $4.2 million from that Fraud Bank Account to a real estate attorney to close on a six-bedroom house in Purchase, New York (the "Purchase Property").

All told, based on the Government's investigation to date, from at least 2009 through at least 2023, the defendant presented Victim Company-1 with at least 17 fake agreements and 17 fake invoices fraudulently calling for Victim Company-1 to make payments to the Fake Broker Companies for non-existent services.  These included 10 fake agreements and invoices causing Victim Company-1 to pay the defendant a total of $753,000 between 2009 and 2022; six fake agreements and invoices causing Victim Company-1 to pay the defendant a total of approximately $8.6 million between 2015 and 2023; and one fake agreement and invoice causing Victim Company-1 to pay the defendant approximately $142,000 in or around 2020–21.

## B.    The Defendant's Aggravated Identity Theft

As part of the fraud scheme, the defendant also repeatedly used names and signatures of other persons without their knowledge or authorization.  From 2015 through 2023, the defendant added the name and signature of an actual person ("Victim-3") on four of the six fake agreements purporting to be between Victim Company-1 and Margoux Media.  These agreements—dated October 2015, July 2018, August 2021, and May 2023—each falsely represented that Victim-3 was the "Chief Operating and Financial Officer" of Margoux Media and had signed the agreements

as such.  In fact, Victim-3 was not Margoux Media's Chief Operating and Financial Officer—as described above, Margoux Media was not a real company and had no employees—and Victim-3 was not aware of the existence of the fake agreements, let alone that his signature was on them.

Rather, Victim-3 had been a high-ranking officer of a company that was a counterparty to an actual 2015 licensing deal with Victim Company-1 relating to a particular commercial property. As part of the defendant's duties at Victim Company-1, the defendant was responsible for negotiating Victim Company-1's licensing of that commercial property to Victim-3's company; thus, in that capacity, the defendant had access to Victim-3's name and signature, which were on the 2015 licensing deal agreement.   Shortly after the 2015 licensing deal, the defendant began using Victim-3's actual name and signature—the *exact* signature from the 2015 licensing deal agreement (*i.e.*, appearing to be copied and pasted)—without Victim-3's knowledge or authorization, on the fake agreements purporting to be between Victim Company-1 and Margoux Media.  Based on the defendant's false representations to his Victim Company-1 superiors (and other employees) that the four fake agreements were bona fide broker agreements, the defendant fraudulently caused Victim Company-1 to pay him a total of $4.725 million, or approximately half of his total proceeds from the fraud scheme.

Similarly, in or around 2020, the defendant used Victim-2's actual name and signature— which the defendant again obtained, without Victim-2's authorization, from a prior actual agreement between Victim Company-1 and Victim-2's company—on a fake broker agreement calling for Victim Company-1 to pay Victim-2 Affiliates approximately $142,000.  After Victim Company-1 issued the requested check written out to Victim-2 Affiliates, the defendant obtained that check, opened a Fraud Bank Account, and deposited it.

## PROCEDURAL BACKGROUND

On December 3, 2024, a Grand Jury sitting in the Southern District of New York returned an Indictment (the "Indictment"), No. 24 Cr. 665 (LAP), charging the defendant in two counts.

Count One charged the defendant with committing wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2, from at least in or about 2009 through at least in or about 2023.  After tracking the statutory language for that crime, Count One's "to wit" clause specified that the defendant "engaged in a scheme to make false statements to Victim Company-1, in order to fraudulently obtain money, and sent and received, and caused others to send and receive, emails and other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme, and aided and abetted the same."  (Dkt. 2 at 1.)

Count Two charged the defendant with committing aggravated identity theft, in violation of Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2, from at least in or about 2015 through at least in or about 2023.  After tracking the statutory language for that crime, Count Two's "to wit" clause specified that the defendant "used and transferred the names and signatures of other persons during and in relation to the wire fraud violation charged in Count One of this Indictment, and aided and abetted the same."  (Dkt. 2 at 1.)

The Indictment also contained forfeiture allegations that explicitly identified, as forfeitable specific property, the Purchase Property, the Manhattan Property, and the funds held in each of the Fraud Bank Accounts and all property traceable thereto.  (Dkt. 2 at 2–3.)

On December 4, 2024, the defendant was arrested pursuant to an arrest warrant issued in connection with the Indictment, presented before this Court and arraigned on the Indictment, and ordered released on conditions.

On December 20, 2024, the Government produced the bulk of the discovery in this case. The discovery included various materials relating to the details of the defendant's fraud scheme

and aggravated identity theft, including, among other things, an *ex parte* application describing the nature of the defendant's alleged fraud scheme and aggravated identity theft in detail.[6]

On August 4, 2025, the defendant filed the Motion to Dismiss.

<u>**ARGUMENT**</u>

The defendant moves to dismiss the Indictment on the basis that the Indictment's allegations are (1) legally defective and (2) violate the statute of limitations. These arguments are meritless. As discussed below, the charges track the relevant statutes and the defendant's alleged misconduct falls squarely within what these statutes prohibit. In addition, the Indictment properly charges the defendant with committing continuing offenses well into the limitations period.

**I.    The Motion to Dismiss the Indictment as Legally Defective Should Be Denied**

**A.    Applicable Law**

**1.    In General**

On a pretrial motion to dismiss pursuant to Fed. R. Crim. P. 12(b), the allegations of the indictment must be taken as true. *See Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952); *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985). The law is well settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956). "The dismissal of an indictment is an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights." *De La Pava*, 268 F.3d at 165.

"Pursuant to Federal Rule of Criminal Procedure 7, 'the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense

---

[6] The Government also had multiple calls with defense counsel relating to the discovery in this case, in which the Government described the nature of the defendant's fraud scheme and aggravated identity theft in detail and identified specific pieces of discovery relating to the charges.

charged.'" *United States v. Vilar*, 729 F.3d 62, 80 (2d Cir. 2013) (quoting Fed. R. Crim. P. 7(c)(1)).

To satisfy this rule, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *Yannotti*, 541 F.3d at 127. Only in "very rare cases," such as those involving a refusal to answer questions before Congress, must an indictment specify "how a particular element of a criminal charge will be met." *United States v. Stringer*, 730 F.3d 120, 125–26 (2d Cir. 2013) (discussing the special case of *Russell v. United States*, 369 U.S. 749 (1962)). Otherwise, "[a]n indictment is sufficient if it first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Id.* at 124.

Where a defendant has been given sufficient notice of the charges against him, for example, by means of discovery, prejudice will not have been shown, and the indictment should stand. *See, e.g.*, *Yannotti*, 541 F.3d at 127 (finding defendant was "well aware of the government's theory of the loansharking conspiracy" and the identities of victims and co-conspirators through the indictment and discovery); *United States v. Walsh*, 194 F.3d 37, 45 (2d Cir. 1999) ("[W]here the indictment has been found even minimally sufficient, a court may look to the record as a whole in determining whether the defendant is protected from double jeopardy in a subsequent prosecution and whether the defendant has had an adequate opportunity to prepare his defense.").

Moreover, it is well settled that, "[u]nless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial," a facially valid indictment is not subject to challenge based on the quality or quantity of evidence. *United States v. Alfonso*, 143 F.3d 772, 776–77 (2d Cir. 1998). This rule exists because indictments are "not meant to serve an evidentiary function," but rather, "to acquaint the defendant with the specific crime with which

he is charged, allow him to prepare his defense, and protect him from double jeopardy." *United States v. Juwa*, 508 F.3d 694, 701 (2d Cir. 2007). Accordingly, "at the indictment stage, [courts] do not evaluate the adequacy of the facts to satisfy the elements of the charged offense." *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021). Rather, "[t]hat is something [courts] do after trial." *Id*. This is consistent with the well-established principle that summary judgment proceedings "do[] not exist in federal criminal procedure." *Id*.

In short, dismissal of an indictment is a "drastic remedy that should be utilized with caution and only in extreme cases." *United States v. Walters*, 910 F.3d 11, 26 (2d Cir. 2018).

### 2.    Void for Vagueness

"The void-for-vagueness doctrine springs from the Fifth Amendment's due process clause," *United States v. Houtar*, 980 F.3d 268, 273 (2d Cir. 2020), and "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Morrison*, 686 F.3d 94, 103 (2d Cir. 2012). "The doctrine addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions." *United States v. Halloran*, 821 F.3d 321, 338 (2d Cir. 2016). Under the fair notice prong, the question is "whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id.*

"When a vagueness challenge alleges lack of notice, the relevant inquiry is whether the statute presents an ordinary person with sufficient notice of what conduct is prohibited." *Houtar*, 980 F.3d at 273. "This requirement assures that statutes do not lull the potential defendant into a false sense of security, giving him no reason even to suspect that his conduct might be within its scope." *Id.* "Statutes need not, however, achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth." *Id.* "There are three related manifestations of the fair

warning requirement": the vagueness doctrine; the rule of lenity, which "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered"; and a bar on courts "applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997).

**B.    Discussion**

**1.    The Indictment Is Sufficient Under Rule 7(c)**

The Indictment in this case, which tracks the language of the relevant statutes, sets forth the approximate time and location of the alleged offenses, and contains particularized "to wit" clauses—in other words, an indictment much like any other in this District—is valid. Count One alleges, among other things, that from 2009 through 2023, in the Southern District of New York and elsewhere, the defendant engaged in a scheme to make false statements to Victim Company-1 in order to fraudulently obtain money, and used emails and other electronic communications in furtherance of that scheme.[7] (Dkt. 2 at 1.) Count Two alleges, among other things, that from 2015 through 2023, in the Southern District of New York and elsewhere, the defendant used and transferred the names and signatures of other persons during and in relation to the wire fraud charged in Count One. (Dkt. 2 at 2.) The allegations set forth in Counts One and Two of the Indictment are sufficient on their own to render the Indictment valid. *See Yannotti*, 541 F.3d at 127 (an indictment "need[s] to do little more than to track the language of the statute charged and

---

[7] While Victim Company-1 is not named in the Indictment, the defendant, who was employed by Victim Company-1 continuously from 2009 through late 2023 and has received the discovery in this case, is plainly aware of Victim Company-1's identity. In any event, it is not necessary that an indictment for wire fraud identify the victim(s). *See, e.g.*, *United States v. Zandstra*, No. 00 CR 209 (RWS), 2000 WL 1368050, at *4 (S.D.N.Y. Sep. 20, 2000) (so holding for mail fraud).

state the time and place (in approximate terms) of the alleged crime"); *Stringer*, 730 F.3d at 122–24 (approving aggravated identity theft count nearly identical to Count Two of the Indictment).

The Indictment in this case, however, does more.  The Indictment also contains detailed forfeiture allegations that identify, as specific forfeitable property, the Purchase Property, the Manhattan Property, and each of the Frank Bank Accounts (Dkt. 2 at 2–3)—*i.e.*, the two real properties that the defendant purchased with most of the fraud proceeds, and the three bank accounts that the defendant used to receive the fraud proceeds.  *See Walsh*, 194 F.3d at 45 (on a motion to dismiss an indictment, the "Indictment as a whole is examined"); *United States v. Adelglass*, No. 20 Cr. 605 (JSR), 2022 WL 6763791, at *2 (S.D.N.Y. Oct. 11, 2022) (similar).  The detailed forfeiture allegations in this case—which identify real properties and bank accounts that are at the heart of the defendant's fraud scheme—combined with the allegations in Counts One and Two of the Indictment, are more than sufficient to satisfy the requirements of Rule 7(c).

In addition, because the "Indictment meets the threshold of minimum sufficiency, the Court may look to the record, including the discovery disclosed to the defendant, to determine whether the defendant is protected from double jeopardy in a subsequent prosecution and whether the defendant has had an adequate opportunity to prepare his defense."  *United States v. Wahab*, No. 21 Cr. 603 (VEC), 2022 WL 17581560, at *2 (S.D.N.Y. Dec. 12, 2022); *see also id.* (where an indictment is minimally sufficient, the Court, considering the record as a whole, "may only dismiss the Indictment 'for lack of specificity' upon a showing of prejudice"); *United States v. Sullivan*, No. S1 02 Cr. 1144 (BSJ), 2004 WL 253316, at *2 (S.D.N.Y. Feb. 10, 2004) ("The Second Circuit . . . has 'repeatedly refused, in the absence of any showing of prejudice, to dismiss charges for lack of specificity.'").  Here, the Government produced discovery to the defendant over eight months ago.  That discovery included, among other things, the fake agreements and invoices the defendant

presented to Victim Company-1; various emails sent by the defendant (using both his own email address and fake email addresses he created) to other Victim Company-1 employees in furtherance of the fraud scheme; email and phone provider records reflecting the defendant's creation and/or use of email addresses and phone numbers he employed as part of the fraud scheme; and bank records reflecting the defendant's opening and use of the Fraud Bank Accounts.  In addition, some documents produced in discovery, such as the Government's *ex parte* application for a certain order—not to mention the factual background in this opposition—provide the defendant with a detailed summary of the wire fraud and aggravated identity theft crimes alleged in the Indictment. *See Wahab*, 2022 WL 17581560, at *3 (finding that the "the record as a whole contain[ed] ample information provided to the Defendants by the Government months ago [in discovery], as well as in its opposition briefing," regarding the nature of the Government's wire fraud theory).

In short, contrary to the defendant's arguments (Def. Mot. at 7–11), the Indictment is sufficient and, in combination with the record as a whole, "more than guards against the possibility that the [defendant] will be prejudiced in [his] ability to proceed at trial or to guard against double jeopardy." *Wahab*, 2022 WL 17581560, at *3.  Of course, to the extent the defendant contests the Government's proof, the defendant will have the opportunity to make those arguments to the factfinder at trial.  Such factual disputes, however, cannot support dismissal of the Indictment.

### 2.    The Indictment States the Material Elements of Each Offense

The defendant also argues that the Indictment is defective because it fails to state the material elements of each offense.  (*See* Def. Mot. at 12–15, 20–21.)  In particular, the defendant argues that the Indictment "contains no reference to a material falsehood or omission, no plausible facts establishing fraudulent intent, and no use of wires 'in furtherance' of any fraud." (*Id.* at 14.) The defendant further argues that the Indictment fails to state the material elements and violates his constitutional rights based on the Supreme Court's decision in *Russell*, 369 U.S. 749, and the

Second Circuit's decision in *United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000).  (Def. Mot. 14–18.)  Each of these arguments fails, as courts have repeatedly held in similar contexts.

*First*, an indictment for wire fraud—especially, where, as here, the indictment charges a years-long scheme including numerous false representations—need not identify specific false statements.  *See Zandstra*, 2000 WL 1368050, at *4 ("[I]t is not necessary that the indictment be more specific as to which materials are alleged to be fraudulent or the exact representations alleged to be inaccurate."); *United States v. Upton*, 856 F. Supp. 727, 740 (E.D.N.Y. 1994) ("[T]he specific transactions or documents which are at the heart of an indictment need not be specified so long as the indictment apprises the defendant of the elements of the charge against him."); *cf. also United States v. Mermelstein*, 487 F. Supp. 2d 242, 251 (E.D.N.Y. 2007) ("A false statement charge, like a charge of health care fraud, need not specify in the indictment the particular false statements upon which the charge is based.").

*Second*, although the materiality of the misrepresentations is not explicitly alleged in the Indictment, it need not be.  The Supreme Court has found that the concept of materiality is essentially subsumed within the definition of fraud, and thus can be inferred as a required element when a scheme to defraud is charged.  *See Neder v. United States*, 527 U.S. 1, 21–25 (1999).  Indeed, in *United States v. Klein*, the Second Circuit held that "an allegation of materiality can be inferred from use of the word fraud in the indictment."  476 F.3d 111, 113 (2d Cir. 2007); *see also United States v. Chime*, No. 11 Cr. 244, 2011 WL 3420717, at *2 (N.D. Ohio Aug. 4, 2011) (holding that an indictment that used the words "fraud" and "fraudulent" satisfied the materiality element).

*Third*, the Indictment sufficiently alleges that the defendant possessed the requisite fraudulent intent.  The Indictment tracks the statutory language regarding the requisite *mens rea* and further alleges, among other things, that the defendant "engaged in a scheme to make false

statements to Victim Company-1, in order to fraudulently obtain money." (Dkt. 2 at 1.) Nothing more is required. *See United States v. Carton*, No. 17 Cr. 680 (CM), 2018 WL 3559172, at *4 (S.D.N.Y. July 10, 2018) (rejecting argument that an indictment did not sufficiently plead "fraudulent intent" and holding that the indictment's allegations tracking the statutory language of the securities fraud statute was "alone . . . sufficient to meet the pleading requirement"); *United States v. Motz*, 652 F. Supp. 2d 284, 296 (E.D.N.Y. 2009) (holding that "fraudulent intent can be inferred because the necessary result of the alleged scheme was to disadvantage [victims]"); *United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651, at *9 (S.D.N.Y. Jan. 18, 2017) (collecting cases rejecting arguments that an indictment did not sufficiently plead "fraudulent intent").

*Fourth*, "a count of wire fraud need not contain specific uses of the wires in furtherance of the scheme." *Goyal*, 2025 WL 307236, at *10; *see also, e.g.*, *United States v. Almaleh*, No. 17 Cr. 25 (ER), 2022 WL 602069, at *5 n.6 (S.D.N.Y. Feb. 28, 2022) ("[A] count of mail fraud or wire fraud need not contain specific uses of the mail or wires in furtherance of the scheme."); *Zandstra*, 2000 WL 1368050, at *4 (S.D.N.Y. Sept. 20, 2000) (collecting cases in which courts held that indictments for mail and wire fraud need not identify specific mailings and wire transfers).

*Fifth*, the defendant's reliance on *Russell* and *Pirro* is misplaced. As the Second Circuit explained in *Stringer*: "[I]t is clear that the Supreme Court's decision in *Russell* must be seen as addressed to the special nature of a charge of refusal to answer questions in a congressional inquiry and not as a broad requirement applicable to all criminal charges that the indictment specify how each essential element is met." 730 F.3d at 125–26. Similarly, the indictment in *Pirro* is plainly distinguishable. *See id.* at 126–27 (distinguishing the statutes at issue in *Pirro* and other cases from the aggravated identity theft violation at issue in *Stringer*, and reaffirming that there is no "universal requirement" that an indictment specify "how a particular element of a criminal charge

will be met"); *see also, e.g.*, *United States v. Hwa*, No. 18 Cr. 538 (MKB), 2021 WL 11723583, at *33 (E.D.N.Y. Sep. 3, 2021) (distinguishing *Pirro* as a case involving esoteric and unclear tax laws). In short, the statute and charges at issue in *Pirro* are a far cry from the traditional wire fraud and aggravated identity theft counts charged in this case. *See, e.g.*, *Stringer*, 730 F.3d at 125–26 (*Pirro*'s holding does not apply to aggravated identity theft count); *Hwa*, 2021 WL 11723583, at *32–33. Unlike in *Pirro*, there is no lack of clarity here as to whether the defendant was entitled to present fake agreements and invoices to his employer, and use other individuals' names and signatures, to fraudulently obtain money.

Last, the defendant relies on *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and argues, without any citation, that "[a]lthough *Iqbal* and *Twombly* were civil cases, the Second Circuit has expressly applied them in the criminal context." (Def. Mot. at 14.) The Government is aware of no Second Circuit case expressly (or implicitly) applying *Iqbal* and *Twombly* in the criminal context, and such an assertion is plainly incorrect.

### 3. The Allegations in the Indictment Are Not Unconstitutionally Vague

The defendant also suggests that the Indictment should be dismissed on constitutional vagueness grounds. (*See* Def. Mot. at 10–12.) While the defendant invokes the "void for vagueness" doctrine in passing (Def. Mot. at 10), he does not explain how the requirements for a vagueness challenge are satisfied, or advance any argument that the wire fraud statute or aggravated identity theft statute are unconstitutionally vague. In any event, any such argument would fail. The wire fraud and aggravated identity theft statutes are not unconstitutionally vague: they do not "fail[] to provide a person of ordinary intelligence fair notice of what is prohibited," nor are they "so standardless that [they] authorize[] or encourage[] seriously discriminatory enforcement." *Person*, 373 F. Supp. 3d at 461; *cf. also United States v. Rybicki*, 354 F.3d 124, 144 (2d Cir. 2003) (holding honest services wire fraud statute facially valid).

Moreover, to the extent the defendant argues that the enforcement of the wire fraud and aggravated identity theft statutes are unconstitutionally vague as applied to the conduct charged here, such a challenge is premature at this stage.  "An implicit requirement of the vagueness test is that it must be clear what the defendant did," and thus, a court will require "full factual development at trial before it can determine whether the relevant statutes failed to provide [the] [d]efendant fair warning that his conduct was prohibited by law, as required by the Due Process Clause."  *United States v. Shvartsman*, 722 F. Supp. 3d 276, 299 (S.D.N.Y. 2024) (collecting cases); *see also, e.g.*, *United States v. Peraire-Bueno*, No. 24 Cr. 293 (JGLC), 2025 WL 2062021, at *6 (S.D.N.Y. July 23, 2025) ("While courts do occasionally find the application of a statute to particular facts unconstitutionally vague, such analysis is generally undertaken after the factual record is developed.").  Accordingly, the defendant's vagueness challenge should be rejected as premature.  *See, e.g.*, *Peraire-Bueno*, 2025 WL 2062021, at *6 (denying as premature motion to dismiss on vagueness grounds, and explaining, "[t]rial in this case will determine Defendants' conduct here, and at that time, the Court can properly assess any vagueness challenge").[8]

## II.    The Motion to Dismiss the Indictment as Time-Barred Should Be Denied

### A.    Applicable Law

The statute of limitations for wire fraud and aggravated identity theft is five years.  18 U.S.C. § 3282.  Where an offense is deemed "continuing," however, the charges may include conduct dating back farther than five years from the time of indictment.  *See United States v. Rivera-Ventura*, 72 F.3d 277, 281 (2d Cir. 1995).  "A 'continuing offense' is, in general, one that

---

[8] The defendant also invokes the 19th Century cases of *United States v. Simmons,* 96 U.S. 360 (1877), and *United States v. Cruikshank*, 92 U.S. 542 (1875), for the general proposition that an indictment must provide the defendant with fair notice of the charges against him.  (Def. Mot. 11–12.)  For the reasons stated in Sections I.B.1 and I.B.2 above, the charges in the Indictment provide him with adequate notice.

involves a prolonged course of conduct; its commission is not complete until the conduct has run its course." *Rivera-Ventura*, 72 F.3d at 281.  "Though some conduct, even before it is concluded, may fit the statutory definition of a crime, thereby permitting institution of a prosecution before the offense is complete, the limitations period for a continuing offense does not begin until the offense is complete." *Id.* (citing *United States v. Toussie,* 397 U.S. 112, 115 (1970)).  "What marks a continuing offense . . . is that each day brings a renewed threat of the evil Congress sought to prevent even after the elements necessary to establish the crime have occurred." *United States v. Hoey*, No. 15 Cr. 229 (PAE), 2016 WL 270871, at *11 (S.D.N.Y. Jan. 21, 2016).  A continuing offense may be found if either "explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." *Toussie*, 397 U.S. at 115.

As to the wire fraud count, the Second Circuit has held that wire fraud is a continuing offense for purposes of the venue statute, 18 U.S.C. § 3237(a).  *See United States v. Rutigliano*, 790 F.3d 389, 396 (2d Cir. 2015) (recognizing that "wire fraud," like mail fraud, "is a continuing offense"); *see also United States v. Smith*, 198 F.3d 377, 384 (2d Cir. 1999) (applying "the same principle" in the statute of limitations and venue contexts for the continuing offense of extortion). The Second Circuit has also affirmed, on plain-error review, a district court's conclusion that wire fraud was a continuing offense for statute of limitations purposes, where the fraudulent money transfers during the scheme "were of a similar nature and continued in succession, and had each transfer been exposed the subsequent transfer would have been less likely to occur." *United States v. Hoey*, 725 F. App'x 58, 62 (2d Cir. 2018) (summary order).

Consistent with the Second Circuit's holdings in *Rutigliano* and *Hoey*, district courts in this Circuit have repeatedly recognized wire fraud and similar offenses as continuing offenses for

statute of limitations purposes. *See Goyal*, 2025 WL 307236, at *10 (recognizing wire fraud as a continuing offense for statute of limitations purposes); *United States v. Bergstein*, No. 16 Cr. 746 (PKC), 2018 WL 2417845, at *8 (S.D.N.Y. May 29, 2018) ("For the continuing offense of wire fraud, the limitations period is five years."); *see also Mermelstein*, 487 F. Supp. 2d at 254 ("Courts . . . have repeatedly held that an indictment brought under the health care fraud, bank fraud, or major fraud statutes may properly charge, in a single count, a pattern of executions, or submissions of fraudulent claims, as part of a single, overarching continuing scheme" (collecting cases)); *accord United States v. Refert*, No. 05 Cr. 30090 (CBK), 2007 WL 30292, at *1–2 (D.S.D. Jan. 3, 2007) (recognizing that health care fraud may be a continuing offense and, applying the analysis in *Toussie,* rejecting a claim that an indictment charging multiple transactions in one count, some of which took place beyond the limitations period and some within it, was time-barred).

As to the aggravated identity theft count, the Second Circuit has recognized that aggravated identity theft is a continuing offense. *See United States v. Cosme*, No. 17-1759-CR(L), 2021 WL 2964322, at *1 (2d Cir. July 15, 2021) (holding that an indictment filed in 2017 that charged a defendant with aggravated identity theft beginning in 2010 was not time-barred because the indictment charged the defendant "with conduct continuing through at least December 2012"); *see also Colello*, 2022 WL 220216, at *2 ("Both of the offenses that [the defendant] is charged with (conspiracy and aggravated identify theft) are continuing offenses.").

**B.    Discussion**

The offenses charged in both Count One and Count Two are continuing offenses.  The defendant engaged in an approximately 15-year-long scheme to defraud his then employer, Victim Company-1, by using fake agreements and fake invoices—at least 17 agreements and 17 invoices in total—calling for Victim Company-1 to make payments to the Fake Broker Companies for non-existent services.  As described above, the defendant took various steps to conceal his fraud

19

scheme, including through the creation of fake email addresses to communicate with other Victim Company-1 employees. In furtherance of the continuing wire fraud offense, the defendant also engaged in a continuing aggravated identity theft offense by repeatedly using the actual names and signatures of other persons, namely, Victim-2 and Victim-3, without their authorization. The defendant's long-running fraud and aggravated identity theft scheme—a sustained pattern of fraudulent conduct lasting well over a decade—is precisely the type of offense that "Congress must assuredly have intended . . . be treated as a continuing one." *Toussie*, 397 U.S. at 115; *see also Rutigliano*, 790 F.3d at 396; *Cosme*, 2021 WL 2964322, at *1.[9]

The defendant does not acknowledge any of the Second Circuit or district court cases in this Circuit recognizing that wire fraud and aggravated identity theft are continuing offenses. Instead, the defendant relies on an out-of-circuit case, *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999), to argue that wire fraud is not a continuing offense. (Def. Mot. at 20–21.) But *Yashar* is easily distinguishable. Contrary to the defendant's suggestion, *Yashar* did not address wire fraud at all, but rather embezzlement under 18 U.S.C. § 666(a)(1)(A)—which, among other things, does not contain the "scheme" language found in 18 U.S.C. § 1343 and similar statutes. *See, e.g.*, *United States v. Smith*, 555 F. Supp. 3d 563, 588 (N.D. Ill. 2021) (concluding that *Yashar*'s holding does not apply to "scheme" offenses, including "mail, wire, and bank frauds"). Indeed, the Second Circuit in *Hoey* relied on *Yashar* when approving wire fraud charges as a continuing

---

[9] While the nature of the repeated aggravated identity theft in this case is sufficient to constitute a "continuing offense," *see Cosme*, 2021 WL 2964322, at *1, the aggravated identity theft count is a continuing offense for the additional reason that it is based on the predicate continuing offense of wire fraud. *Cf. United States v. Payne*, 591 F.3d 46, 69 (2d Cir. 2010) ("When a defendant is convicted of violating § 924(c)(1)(A) for using or carrying a firearm during and in relation to a crime that is a continuing offense, the § 924(c)(1) crime itself is a continuing offense."). *See also Cosme*, 2021 WL 2964322, at *1 n.8 (noting without resolving the open question whether a predicate continuing offense automatically renders aggravated identity theft a continuing offense).

offense. *See Hoey*, 725 F. App'x at 62 (citing *Yashar*, 166 F.3d at 875–76 ("The hallmark of the continuing offense is that it perdures beyond the initial illegal act, and that 'each day brings a renewed threat of the evil Congress sought to prevent.'" (quoting *Toussie*, 397 U.S. at 122))).

Accordingly, the defendant's motion to dismiss the wire fraud and aggravated identity theft charges as time-barred should be denied.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the defendant's Motion to Dismiss should be denied in its entirety without a hearing.

Dated:  New York, New York
        September 3, 2025

                                        Respectfully submitted,

                                        SEAN S. BUCKLEY
                                        Attorney for the United States,
                                        Acting under Authority Conferred
                                        by 28 U.S.C. § 515

                        By:     */s/ Adam Z. Margulies*
                                        Adam Z. Margulies
                                        Assistant United States Attorney
                                        Southern District of New York
                                        (212) 637-2345

21